In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-4099

LEAH A. LAPKA,

*Plaintiff-Appellant*,

*v.*

MICHAEL CHERTOFF, Secretary of
Homeland Security, and the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 668—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 13, 2007—DECIDED FEBRUARY 29, 2008

Before EASTERBROOK, *Chief Judge*, and CUDAHY and SYKES, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Leah Lapka is an adjudication officer of the Bureau of Customs and Immigration Services, a division of the Department of Homeland Security (DHS). Lapka alleges that she was raped by a fellow DHS employee while she was attending mandatory training sessions at a Federal Law Enforcement Training Center (FLETC). She believes that the DHS failed to adequately

investigate the assault and failed to take reasonable steps to protect her from further harm. Instead of helping her, Lapka claims that the DHS improperly denied her access to investigative reports and began retaliating against her for filing a complaint with the Equal Employment Opportunity Commission (EEOC). Lapka participated in a unsuccessful mediation process and received her right to sue letter on November 4, 2004. She then sued the DHS and Michael Chertoff (in his official capacity as Secretary), alleging a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a) and a violation of the Privacy Act, 5 U.S.C. § 552a. The district court granted summary judgment for the defendants on all claims. We affirm.

## I. BACKGROUND

We recount the story in the light most favorable to Ms. Lapka. Lapka began working for the Immigration and Naturalization Service (INS)[1] as a district adjudication officer in 2001. On June 4, 2002, Lapka was sent by the INS to attend a month-long training course at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.

---

[1] The DHS was formed on March 1, 2003. The former INS was split into three agencies within the DHS: The Bureau of Immigration and Customs Enforcement (ICE), Bureau of Customs and Border Protection (CBP) and Bureau of Citizenship and Immigration Services (CIS). While they were at the FLETC facility, both Lapka and her alleged assailant, Paul Garcia, worked for the INS (although in different locations). After the DHS was formed, Lapka worked for CIS while Garcia worked for CBP (although both technically work for the DHS).

The training sessions were specifically designed for adjudication officers and Lapka was required to attend. She was assigned to stay at a Days Inn motel in Brunswick, Georgia, close to the FLETC facility. The facility is a restricted-access site that includes dormitories, class-rooms, a dining facility and a bar. On June 15, 2002, Lapka and her colleague, Heather Legacy, encountered a man named Paul Garcia on the FLETC campus. Garcia was an INS inspector who worked at O'Hare Aiport in Chicago; he offered the women a ride back to their hotel should they decide to go to the FLETC bar that evening but they declined the offer. Lapka and Legacy went to dinner and later decided to meet the other trainees at the FLETC bar. They began socializing and drinking and soon became visibly intoxicated. They began dancing with a number of people, including Garcia. Garcia made sexual advances toward Lapka but she refused them. By the end of the night, Lapka was having difficulty standing up or holding on to her drink.

Taxis were scarce. Lapka and Lagacy were forced to accept a ride from Garcia, who drove them back to their hotel. Lapka was barely responsive at the time, although she remembers that Garcia tried to fondle her. Garcia helped her up to her room and then followed her inside. Lapka passed out once they entered the room, but was awakened to find Paul Garcia sexually assaulting her. She passed in and out of consciousness. When she woke up, she was taken to the hospital. Lapka reported a possible date rape and was treated for alcohol poisoning. For reasons that are unclear, the employees at the hospital did not preserve any evidence for law enforcement. Two weeks later, Lapka reported the incident to FLETC personnel. They summoned a FLETC investigator and called the

Brunswick, Georgia police department. Lapka gave a formal statement to a FLETC investigator and to a Brunswick police detective; the Brunswick police also interviewed Paul Garcia. The FLETC officials told Lapka that a report would be forwarded to the INS Office of the Inspector General (OIG) and that she would be hearing from someone.

Lapka returned to Chicago. Months passed and no one contacted her about the status of the investigation. Lapka had become withdrawn; she had trouble sleeping and began losing weight. She had frequent bouts of crying and flashbacks of the assault. In March 2003, Lapka decided to follow up on the investigation. So, on March 3, Lapka obtained a copy of the Brunswick police report and discovered that the police had declined to prosecute due to a lack of evidence. Shortly thereafter, Lapka told her supervisors, Marilyn Roraff and Stacy Summers, what had happened. On March 24, she inquired about the status of the INS investigation; she was surprised to hear that the investigation had been closed (with no action taken against Paul Garcia) and that privacy considerations precluded the release of the findings.

On May 15, Lapka was startled to see Jaime Garcia, Paul Garcia's brother, in the reception area of her office at 230 South Dearborn. Jaime formerly worked at 230 South Dearborn and was apparently visiting his former co-workers there. 230 South Dearborn was, at that time, an office of the Bureau of Customs and Immigration Services; Jaime, like his brother Paul, now worked for the DHS Bureau of Customs and Border Protection at O'Hare Airport. Lapka was disturbed by Jaime's presence because she could not tell the brothers apart and actually believed that she was in the presence of her previous assailant. The experience exacerbated Lapka's feelings

of fear and anxiety. She contacted Summers to complain about Jamie's visits to the office; Summers told Lapka that she could not punish Jamie for the actions of his brother but assured her that she would take action if the visits became habitual or if Jaime mentioned the assault to anyone in the office. Jamie visited the office again on May 22 and June 12. During the second week of June 2003, Lapka contacted an EEO Intake Counselor about pursuing an EEOC claim. She filed a complaint with the EEOC on July 24, 2003.

On August 22, Paul Garcia visited the 230 South Dearborn Building. Although Lapka was not working that day, she was informed about Paul's visit by a co-worker. Paul stayed for about forty minutes, walking down the hallways, peering into offices, and talking to officers he knew (Paul and Jaime's mother had worked for a long time in the building). There is no evidence that Paul attempted to contact Lapka, but Lapka became terrified. She began taking days off work because she was so worried about the Garcia brothers' visits. She again complained to her supervisors. They said that they would attempt to contact Paul's supervisor and that they would institute a new visitation policy. When they did not act fast enough, Lapka sought an order of protection in state court, which was granted on September 5. On September 12, the District Director instituted an office-wide policy requiring supervisor approval before any visitor not on official duty could be allowed entry to the Chicago office. While it is not clear that the policy was consistently enforced, Summers did remind the staff to obey the policy. Lapka urged her supervisors to call the Federal Protective Services (FPS) and bar Garcia from entering her workplace pursuant to the court order. Lapka's supervisors explained that they did

not contact Garcia about the order because it was an agreed order of which Garcia was on notice. Paul Garcia never again entered the building and never tried to contact her.

Lapka believes that DHS officials then began retaliating against her for her EEO activity. Lapka contends that her supervisors assigned her all the mandamus cases in the office as a collateral duty and assigned her more duties than she had previously been assigned. The mandamus assignments were apparently more difficult and time-consuming, yet the DHS did not allow her any extra time to finish them. She fell behind and her performance rating dropped from "outstanding" to "excellent." Lapka believes that the DHS used her backlog as an excuse to transfer her to a different job, which was not covered by her protective order, thus rendering her more vulnerable to Paul Garcia's visits. Her application for the Department of Labor's Employee Injury Compensation program was delayed and her voluntary leave program request was broadcast nationwide but not at the local level. In March 2005, Lapka was diagnosed with posttraumatic stress disorder. She is currently on indefinite medical leave.

## II. DISCUSSION

Our standards of review are familiar. We review the district court's grant of a motion for summary judgment de novo. *Jackson v. County of Racine*, 474 F.3d 493, 498 (7th Cir. 2007). Summary judgment is appropriate only "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Shermer v. Illinois Dep't of Transp.*, 171 F.3d 475, 477 (7th Cir. 1999). We view the facts in the light most favorable to Lapka and draw all reasonable inferences in her favor. *Anderson v. Liberty*

*Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). We turn now to her claims.

## 1. Failure to Exhaust Administrative Remedies

The DHS begins by renewing an argument it lost in the district court—namely, that Lapka's hostile environment claim is time-barred because she failed to contact an Equal Employment Opportunity (EEO) counselor within forty-five days of the alleged assault. It is true that federal employees who want to file discrimination claims with the Equal Employment Opportunity Commission (EEOC) must contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). This "counseling requirement" serves an important function; it gives agencies an opportunity to resolve an employee's complaint informally by conducting their own internal investigations. *See Brown v. Marsh*, 777 F.2d 8, 13-14 (D.C. Cir. 1985). Thus, although we have construed this requirement as a statute of limitations rather than a jurisdictional prerequisite, we bar claims if the forty-five day requirement is not satisfied and there is no occasion for equitable tolling. *See, e.g.*, *Rennie v. Garrett*, 896 F.2d 1057, 1061-62 (7th Cir. 1990). The DHS argues that the forty-five day period began to run on June 16, 2002, the date of the alleged assault. It is undisputed that Lapka did not contact an EEO counselor until she called the Dallas intake center in the second week of June 2003.

We believe that Lapka's claim is timely. To determine the timeliness of her contact with the counselor, we must determine when the counseling requirement was triggered. To do this, we must carefully identify the exact

nature of Lapka's claim. *See Ledbetter v. Goodyear Tire & Rubber Co.*, ___ U.S. ___, 127 S. Ct. 2162, 2167, 167 L. Ed.2d 982 (2007). As the district court noted, Lapka is not making a "series of discrete claims, one arising from the assault, a separate claim arising from the failure to investigate, and perhaps another claim arising from the Garcia brothers' later visits to her workplace." *Lapka v. Chertoff*, No. 5 C 668, 2006 WL 3095668, at *4 (N.D. Ill. Oct. 30, 2006). Instead, she is making a single hostile environment claim "composed of" a series of events. Of course, in articulating her claim, Lapka must refer to concrete events. It would be unintelligible otherwise. But her legal claim is for the cumulative effect of those events, and that effect forms a "single unlawful employment practice." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed.2d 106 (2002).

The question, then, is when this hostile environment claim accrued. *See Morgan,* 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed.2d 106; *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006). *Morgan* addressed the timeliness of hostile environment claims under 42 U.S.C. § 2000e-5, which requires potential litigants to first file claims with the EEOC within a specified period. The Court, noting the "exceptional" nature of hostile environment claims, held that such claims "will not be time-barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122, 122 S. Ct. 2061, 153 L. Ed.2d 106. Other circuit courts have used *Morgan* to calculate timeliness under § 1614.105(a)(1). *See Jensen v. Henderson*, 315 F.3d 854, 859-61 (8th Cir. 2002); *Lyons v. England*, 307 F.3d 1092, 1106 n.6 (9th Cir. 2002); *McFarland v. Henderson*, 307 F.3d 402, 408 (6th Cir. 2002). Under § 1614.105(a)(1), we must

determine when the "discriminatory matter" occurred, and we too believe that *Morgan* provides the appropriate standard. Lapka was raped on June 15, 2002. She learned that the DHS had closed its investigation into the assault without taking any action against Paul Garcia on March 24, 2003. Jaime Garcia visited the 230 South Dearborn Building on May 15, 2003, May, 22, 2003, and June 12, 2003. Paul Garcia visited on August 22, 2003. These are the component acts of Lapka's claim. *Morgan* dictates that if at least one of these acts took place within the statutory period, the claim is not time-barred. Because Lapka contacted an EEO counselor in Dallas during the second week of June 2003, within forty-five days of Jaime Garcia's visits, her claim is timely.

Relying on our decision in *Pruitt*, the DHS argues that the fact that "discrete acts may have been mixed with a hostile environment does not extend the time." *Pruitt*, 472 F.3d at 927. This reflects a basic misunderstanding of the meaning of a "discrete act." A discrete act is not simply any concrete act. When *Morgan* and *Pruitt* speak of a discrete act, they mean a discrete claim of discrimination that is actionable by itself—what the Supreme Court has recently called a "freestanding violation." *Ledbetter*, 127 S. Ct. at 2174, 167 L. Ed.2d 982. Examples would include "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan,* 536 U.S. at 114, 122 S. Ct. 2061, 153 L. Ed.2d 106. The essence of a discrete act of discrimination is that it forms "a separate actionable 'unlawful employment practice.' " *Id*., 122 S. Ct. 2061, 153 L. Ed.2d 106. What makes a hostile environment claim exceptional is that the acts that constitute it do not give rise to a cause of action by themselves. The alleged rape in this case was not actionable by itself; it was only *after* the DHS failed to investigate the assault and

failed to take steps to protect Lapka that the alleged hostile environment was formed.

**2. Lapka's Hostile Work Environment Claim**

Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To establish a prima facie case, Lapka must establish that "she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006). These elements are evaluated in light of the "particular facts and circumstances" of the case. *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002) (citations omitted). Lapka has established the first three elements but she has failed to show a basis for employer liability.

The first two elements are easily satisfied. We may assume that Lapka's allegation that she was raped by a co-worker is true. It goes without saying that forcible rape is "unwelcome physical conduct of a sexual nature." *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002). Rape is also, by definition, a form of harassment based on sex. *See Brock v. United States*, 64 F.3d 1421, 1423 (9th Cir. 1995). The DHS also suggests that the assault does not evidence *workplace* harassment because Lapka and Garcia were socializing after hours and the assault occurred in a private hotel room. But harrasment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences

in the workplace. *See Doe v. Oberweis Dairy*, 456 F.3d 704, 715-16 (7th Cir. 2006). The FLETC bar was a part of the FLETC facility, and Lapka first encountered Garcia on the FLETC campus, so the event could be said to have grown out of the workplace environment. *Id*. We further note that Lapka and Garcia were required by their employer to attend these training sessions; they were on "official duty" while they were there. The FLETC facility is different from a typical workplace where "employees go home at the close of their normal workday." *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir. 2001). Trainees at this facility attend employment-related training sessions, eat in the FLETC cafeteria, drink at the FLETC bar and return to dormitories and hotel rooms provided by the DHS. Employees in these situations can be expected to "band together for society and socialize as a matter of course." *Id*. Lapka has established that she was subject to sexual harassment because of her sex, at least for the purposes of summary judgment.

Lapka must also show that the harassment she experienced was "severe or pervasive" enough to create an abusive environment and to alter the conditions of her employment. *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. 2399, 91 L.Ed.2d 49. This element has both an objective and subjective component. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). We have no reason to doubt that, subjectively, Lapka perceived her work environment to be hostile; she began to lose weight and miss work, and she was ultimately diagnosed with posttraumatic stress disorder. But the DHS argues that no reasonable person could have found the visits by the Garcia brothers to be objectively hostile. The visits, however, cannot be viewed in isolation. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam)

("Workplace conduct is not measured in isolation"); *Meritor Sav. Bank*, 477 U.S. at 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (workplace conduct is judged from the totality of the circumstances). They must be viewed in the context of the sexual assault.

The sexual assault alone may have been sufficient to create an objectively hostile environment. It is true that it turned out to be an isolated incident and, thus, was not pervasive. But we have repeatedly stressed that the phrase "severe or pervasive" is disjunctive. *See Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950 (7th Cir. 2005); *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). It is well settled that "even one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). We have held that assaults within the workplace create an objectively hostile work environment for an employee even when they are isolated. *See Erickson*, 469 F.3d at 604; *Hostetler*, 218 F.3d at 807; *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999); *DiCenso v. Cisneros*, 96 F.3d 1004, 1009 (7th Cir. 1996); *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 464 (7th Cir. 1990); *see also Windermere*, 301 F.3d at 966; *Ferris*, 277 F.3d at 135. The severity of the assault alleged in this case would be sufficient to establish the third element of Lapka's prima facie case. The result is no different if one focuses on the visits paid by the Garcia brothers, which occurred shortly after the sexual assault and in its context. The continued presence of a rapist in the victim's workplace can render the workplace objectively hostile because the rapist's presence exacerbates and reinforces the severe fear and anxiety suffered by the victim. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 n.18 (7th Cir. 1993).

We move now to the basis for employer liability. Lapka does not claim that the DHS should have known that Paul Garcia posed a danger to women, nor does she claim that the DHS was negligent in hiring him. So Lapka must proceed on a theory of co-worker liability, which is basically a theory of supervisory negligence.[2] *See Guess*, 913 F.2d at 465. The DHS can be held liable for Garcia's harassment if it "unreasonably fail[ed] to take appropriate corrective action . . . reasonably likely to prevent the misconduct from recurring." *Id*. The emphasis is on the prevention of future harassment. *See McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996).

Lapka first faults the DHS for failing to investigate the alleged assault. She focuses largely on what the District Director should have done to follow up on her complaint. She notes that the District Director made no attempt to contact Paul Garcia, Heather Legacy or the Brunswick District Attorney's office. She is also upset that no action was taken against Garcia. Of course, the "hallmark of a reasonable corrective action" is a prompt investigation. *Cerros*, 398 F.3d at 953-54. This is not a case in which no investigation was conducted at all. *See Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1275 (7th Cir. 1991). The investigation in this case was in fact initiated promptly; when

---

[2] We should mention at this point that the DHS claims that Paul Garcia was not a "co-worker" of Lapka but rather "someone who happened to be employed by the same agency." Whatever the incidental merits of this distinction, it is irrelevant. Employer liability can be imposed when the harassment is committed by co-workers, *see Ferris*, 277 F.3d at 135, or by third parties, *see Lockard v. Pizza Hut Inc.*, 162 F.3d 1062, 1072 (10th Cir. 2002).

Lapka informed FLETC personnel about the assault, they immediately called in a FLETC investigator and the Brunswick police department. The police took a formal statement from Lapka and also interviewed Paul Garcia. The FLETC officials obtained the police report and forwarded it, along with the FLETC report, to the INS Office of the Inspector General, which reviewed the claim before forwarding it back to the DHS. The DHS then decided not to pursue the issue further. The police report already contained detailed statements from Lapka and Garcia; the DHS knew that the police had decided not to prosecute due to a lack of evidence. Unfortunately, no rape kit was taken at the hospital and Lapka could not remember many of the details of the night of the alleged rape because she was passing in and out of consciousness. It was reasonable for the DHS to believe that it, too, had insufficient evidence to proceed against Garcia. Lapka would have preferred a different result but the emphasis of Title VII in this context is not on redress but on the prevention of future harm. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). So "the question is not whether the punishment was proportionate to [the] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1034, 1049 (7th Cir. 2000). We believe that the DHS did.

Lapka also claims that the DHS failed to protect her from visits by the Garcia brothers. It is not clear that the DHS could have prevented the visits by Paul's brother Jaime; he never tried to contact Lapka and he had nothing to do with the original assault. Lapka's supervisor told her that she would monitor Jaime's behavior. That was sufficient. The

visit by Paul were more troubling. But the DHS responded to Lapka's complaints by adopting a new policy demanding that visitors to Lapka's building be on "official business." This policy was announced only two weeks after Paul Garcia's visit to Lapka's place of work. It appears that the DHS Director did contact Garcia's supervisor and tell him not to send Garcia to 230 South Dearborn on official business. Because neither of the Garcia brothers worked for the Bureau of Immigration and Customs Enforcement it was unlikely that they would have official business there. We have noted that taking effective steps to physically separate employees and limit contact between them can make it "distinctly improbable" that there will be further harassment. *See Tutman*, 209 F.3d at 1048-49; *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999); *Saxton*, 10 F.3d at 536. Physical separation had been achieved here. Even if Paul Garcia could have reentered the building, there was little likelihood that he would. And, in fact, Paul Garcia never visited again. The "efficacy of an employer's remedial action" is "material" to our inquiry into the reasonableness of the response. *Cerros*, 398 F.3d at 954.

Lapka's last contention is that the DHS should have contacted FPS and told it to deny the Garcia brothers entry into the building, and that the DHS should have informed Garcia of the protective order. Again, there is no evidence that Paul Garcia was actually trying to contact Lapka. Perhaps the Director should have banned Garcia outright from Lapka's building; this may have been the more effective course. But Garcia knew about the order because it was an agreed-upon order. It is not availing to say that the employer "should have taken even more aggressive measures." *Berry*, 260 F.3d at 813. The measures taken by employers will often "not meet the plaintiff's expecta-

tions." *Id*. Title VII requires only that the employer take steps reasonably likely to stop the harassment. *Saxton*, 10 F.3d at 536. The DHS took reasonable steps in this case; that is enough to justify denial of Lapka's claim.

### 3.  Lapka's Retaliation Claim

Lapka's original complaint did not include a claim for retaliation, although she would later file a retaliation claim with the EEOC. Nevertheless, the district court read her response to summary judgment as asserting such a claim. *Lapka*, 2006 WL 3095668, at *5. Section 2000e-3(a) of Title VII "forbids an employer from 'discriminating against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made charge, testified, assisted, or participated in' a Title VII proceeding." *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2410, 165 L. Ed.2d 345 (2006). In order to succeed on a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." *Id.*, 165 L. Ed.2d 345. An action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2414, 165 L. Ed.2d 345. Examples of such an action would include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). As this Court has cautioned, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441

(7th Cir. 1996). We believe that here Lapka failed to establish one.

Lapka first complains that as a form of retaliation she was assigned all the mandamus cases, which were more difficult and time-consuming than other cases. Lapka, however, already handled mandamus cases; the fact that she received more of them did not significantly alter her job responsibilities. *See Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005). Lapka was not required to work extra hours, did not suffer any loss of pay and was not disciplined for failing to complete her work. *See Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). Lapka argues that the increased load of mandamus cases led her to fall behind in her work and caused her performance rating to fall from "outstanding" to "excellent." But lower performance ratings are not actionable unless they are accompanied by tangible job consequences. *See Whitaker v. Northern Illinois Univ*, 424 F.3d 640 (7th Cir. 2005); *Longstreet*, 276 F.3d at 384; *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001). And the fact that the lower rating prevented her from a merit bonus is not enough to make it a materially adverse action. *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996). Similarly, the relocation to an office across the street cannot be deemed material. *Savino*, 197 F.3d at 937. In some situations, such seemingly trivial measures might be considered retaliation. *Washington*, 420 F.3d 658. Lapka claims that the DHS was exploiting one of her known and obvious vulnerabilities because the new location was not covered by her protective order against Paul Garcia's visitations. But, again, all contact between Lapka and Paul Garcia had long ago ceased.

**4. Lapka's Privacy Act Claim**

Beginning on July 11, 2003, Lapka filed a number of formal requests with FLETC, the INS, and the Department of Justice OIG for access to records and reports regarding the investigation into the June 2002 assault. The requests were made pursuant to the Privacy Act, 5 U.S.C. § 552a. The requests took a rather circuitous route, but the DHS ultimately denied them. Lapka now brings a claim under the Privacy Act for its failure to produce the records. Although she does not specify the subsection under which she is proceeding, we assume that she is suing for access under § 552a(g)(1)(B).[3] Under § 552a(d)(1), an employer must allow an employee an opportunity to access and review records that pertain to her. The Act provides a civil remedy for a failure to comply with § 552a(d)(1). A successful plaintiff is entitled to injunctive relief and, if the plaintiff has "substantially prevailed" in the litigation, the court may also award attorney's fees and costs. 5 U.S.C. § 552a(g)(3)(B). Section 552a(g)(3)(B) does not provide for damages in an access case under the Privacy Act.

After this litigation began, an assistant United States Attorney sent a letter to Lapka's counsel stating that he had "convinced [his] client to permit disclosure of the reports"

---

[3] At times, Lapka seems to complain that the DHS failed to maintain accurate records; such a failure would be actionable under § 552a(g)(1)(C). Actions under § 552a(g)(1)(C), however, require a plaintiff to show that an "adverse determination" was made because of those inaccuracies, something Lapka does not allege. Her argument could also be construed as a failure to make necessary amendments to the records, which invokes § 552a(g)(1)(A). Lapka has not shown, however, that she has requested such an amendment.

if the disclosure was made pursuant to a protective order. Gov. Ex.25. Shortly thereafter, the DHS turned over redacted copies of the records in question to Lapka. Lapka does not challenge any of the redactions; she appears to have got what she wanted. Because Lapka has received what she requested, her claim for injunctive relief is moot. *Cf. DeBold v. Stimson*, 735 F.2d 1037, 1040 (7th Cir. 1984). The fees and costs issue is not enough to keep the merits of her Privacy Act claim alive. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200, 108 S. Ct. 1717, 100 L. Ed.2d 178 (1988); *Anderson v. U.S. Dep't of Health & Human Servs.*, 3 F.3d 1383, 1385 (10th Cir. 1993). The fact that she may have received the records "late" does not change the result. *See Lovell v. Alderete*, 630 F.2d 428, 430-31 (5th Cir. 1980). Thus, we will not pass on the merits of her Privacy Act claim.

Lapka's ostensible claim for attorney's fees is not moot. Nevertheless, we do not believe that she is entitled to them under *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 605, 121 S. Ct. 1835, 149 L.Ed.2d 855 (2001). Before we consider her to be a "prevailing party," Lapka must have shown that she has won some form of "judicially sanctioned relief." *T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 478 (7th Cir. 2003). Neither of the orders entered by the district court, however, suggests that this is the case. The first order did not compel the disclosure of the records; it merely authorized it. The second order, which specified that the use of the records was subject to terms and conditions, was designed for the benefit of DHS and cannot be treated as a victory for Lapka.

### III. Conclusion

We regret any harm that may have come to Ms. Lapka on June 15, 2002. We certainly would not want to be taken for downplaying the serious nature of sexual assaults. But Lapka has not given us a sufficient reason to hold the DHS liable for her injuries. Lapka and her alleged assailant were effectively separated when they returned to Chicago. The DHS did not act negligently nor, we believe, did it take actions designed to dissuade her from pursuing her complaints. Its response may not have been perfect in all respects, but it was adequate. The decision of the district court is Affirmed.