In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2212

BRUCE BARTON,

*Plaintiff-Appellant,*

*v.*

ZIMMER, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:06-CV-208—**Theresa L. Springmann**, *Judge.*

ARGUED NOVEMBER 5, 2010—DECIDED OCTOBER 18, 2011

Before EVANS*, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge.* Bruce Barton was employed in the sales-training department at Zimmer, Inc., an Indiana-based manufacturer of orthopedic devices. In May 2004

---

* Circuit Judge Terence T. Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

Zimmer assigned Andy Richardson to supervise the department. During the course of the next year, Richardson removed many of Barton's primary job duties because he thought Barton, age 57, was too old. Barton lodged an age-discrimination complaint with Richard Abel, Zimmer's Vice President of Human Resources, and also with the Equal Employment Opportunity Commission ("EEOC"). Abel investigated the claim and eventually fired Richardson.

In the meantime, however, Barton went on medical leave, as authorized by the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* He remained on leave until shortly before Richardson was fired. Sherri Milton became the department's new supervisor, and she assigned Barton to revamp one of Zimmer's training classes. The pressure of this assignment proved too much for Barton. He suffered a psychological breakdown, exhausted his disability leave, and retired. He then sued Zimmer for discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and for interference with his right to reinstatement under the FMLA. The district court granted summary judgment for Zimmer.

We affirm. Barton's ADEA claims fail for lack of causation and any available remedy. Although the evidence, viewed in Barton's favor, establishes that Richardson discriminated against him because of his age, the ADEA provides no remedy because the discrimination did not cause any loss and was not linked to the disability that later precipitated Barton's early retirement. Moreover,

there is no evidence that either Abel or Milton retaliated against Barton for complaining about Richardson's discrimination. Finally, Barton has no claim under the FMLA because when he returned to work after his medical leave, the company assigned him equivalent duties without regard to his medical leave.

## I. Background

Zimmer manufactures and sells orthopedic devices, such as artificial hips and knees. The company's Sales Training Department includes the Director of Sales Training as well as several managers who report to the Director. Historically the department had three managers with the titles of "Manager, Sales Training" ("MST"), each responsible for a product-specific area: "Knee MST," "Hips MST," and "Trauma & Extremities MST" ("T&E MST").

Bruce Barton began his career at Zimmer in 1993 as the Director of Sales Training. After a few years, he was demoted to Knee MST (at his request to avoid termination), and he held that position for over a year. In 1998 Zimmer created a fourth manager position specifically for Barton: Manager, Performance, Improvement & Development ("MPID"). In this role Barton was responsible for teaching general selling skills, as opposed to product-specific sales.

In May 2004 Zimmer promoted Andy Richardson to Director of Sales Training. In that capacity Richardson was Barton's immediate supervisor. He was a terrible manager. Among other things, Richardson made several

comments about wanting to get rid of "old guys" like Barton. During the next year, Richardson removed Barton's most significant job duties—teaching general selling skills—and replaced Barton's classes with his own program called "Power Selling," which he taught himself. He then trained a younger employee to be his Power Selling protégé. Zimmer concedes for the sake of argument that Richardson reduced Barton's job duties because of his age.[1]

In late May 2005, Richardson gave Barton a bad performance review. A few days later, Barton emailed Richard Abel, Zimmer's VP for Human Resources, alleging age discrimination. The next day, Barton left for a previously scheduled one-week vacation. While Barton was gone, Richardson told various employees that Barton was "done" at Zimmer. Barton, who has a history of anxiety and panic attacks, heard about Richardson's comments and became emotionally unstable. Instead of returning to work after his vacation, Barton went on FMLA leave until late August to address his mental-health needs.

During Barton's leave, Abel met twice with Richardson to discuss Barton's complaint. Richardson said he wanted Barton terminated, or at least removed from the

---

[1] Barton also alleged that Richardson tormented him in an effort to make him quit, but he has not challenged the part of the district court's order granting summary judgment on his hostile-work-environment claim. Nor has he developed a constructive-discharge argument based on Richardson's conduct.

department, ostensibly for poor performance. Based on Richardson's assessment of Barton, Abel initially agreed. Although Abel communicated with Barton during this time, the two never spoke at length about the discrimination claim because Abel thought it was inappropriate to question Barton while he was recovering from a panic attack allegedly induced by Richardson. While on leave, Barton filed an age-discrimination charge with the EEOC.

On August 22 Barton returned to work, met with Abel, and explained for the first time that Richardson had stripped away many of his job duties. Abel was surprised. Based on this new information, Abel believed that Barton would not be able to return successfully until the conflict between the two was resolved; he reserved judgment about how to proceed until all three of them could meet. When they did, Abel sensed the tension between Richardson and Barton, so he asked Barton to continue on paid administrative leave pending further investigation. Abel's inquiry revealed that Richardson was a divisive leader and belittled nearly everyone in the Sales Training Department. Abel recommended that Richardson be fired. Zimmer terminated Richardson effective September 12 and internally transferred Sherri Milton to replace him as the Sales Training Director.

Milton arrived at a department in transition. Power Selling was the most frequently taught course, and Richardson had been its primary teacher. Knee MST Scott Bowman and Knee Assistant Manager Andy Radford were the only others with Power Selling experience. To

fill the gap, Milton decided that the other managers—Barton (MPID), Mike Schieferstein (Hips MST), and Larry Cline (T&E MST)—needed to assist Bowman and Radford. Each would pick up a few Power Selling sessions, most of which were on weekends, and each was required to demonstrate competency in this teaching approach. In addition, Zimmer was in the process of shifting its training from live to online classes, so live curricula needed to be updated.

Barton returned to work on September 13, Milton's first day as the Director and the day after Richardson's termination. Initially, Barton had little to do. Richardson had reduced his selling-skills duties, and before his leave he had been working on short-term projects that were completed. On his first day back, Milton asked him to observe a Power Selling class. The next day she told Barton, Schieferstein, and Cline that they would have to assist in teaching a Power Selling class on an upcoming weekend and would need to prepare a dry run for management.

During this meeting, Barton raised the subject of Richardson's conduct. Milton replied that she did not want to hear any complaints about Richardson because the company was moving on. According to Barton, Milton also said she thought Richardson was a true genius and had done good things for Zimmer. After the meeting Barton filed another charge with the EEOC, this time alleging that Milton, by assigning him Power Selling duties, was retaliating against him for filing the prior EEOC charge against Richardson. Barton performed poorly in his Power Selling dry run.

Milton thereafter decided to assign Barton to revamp one of Zimmer's knee classes. Initially, Barton was to assess which aspects of the class needed updating, and later, he was told to develop new content for the course. The new course was to be taught primarily by subject-matter experts, with Barton moderating and teaching certain portions of the class. The parties dispute whether Barton was actually qualified to perform these tasks; Barton claims that he knew little about Zimmer's artificial knees and stated as much to Milton at the time. But Barton was formerly the Knee MST and presumably knew the product line. On that basis Milton believed Barton was capable of updating and teaching the knee class. She also referred Barton to various internal resources and asked some knowledgeable people within the company to assist him. Barton believed these resources were insufficient. After working for several months on the new class, Barton presented a portion of the updated content to management. According to Milton, Barton's "new" material was essentially the same as the old course. The scheduled debut of the new course was just one month away, and Milton told Barton she was worried he would not make the deadline.

In response to Milton's critique, Barton had another psychological break. He first complained to Abel that Milton's requests were unreasonable and that she was intentionally setting him up to fail in retaliation for his prior EEOC charges. Barton went to his doctor, who ordered him off work for a week to be evaluated. After using up his remaining FMLA leave (he had just one

day left), Barton took short-term and then long-term disability leave, both funded by Zimmer. Barton eventually filed a claim for total-disability benefits with the Social Security Administration. The claim was granted, with an onset date of February 7, 2006, the day he presented the new course to management. On November 2, 2006, Barton accepted a retirement package from Zimmer. Based on his permanent disability, Barton has not sought work since.

Barton sued Zimmer for discrimination and retaliation in violation of the ADEA and also for interference with his FMLA rights. He alleged that Richardson, Milton, and Abel improperly removed his selling-skills teaching duties, failed to return him to his previous position after his FMLA leave, and set him up to fail once he returned by assigning him to revise the knee class. Zimmer moved for summary judgment, which the district court granted in part, dismissing most of Barton's claims. Only one claim was left standing: whether Richardson discriminated against Barton by taking away his selling-skills duties. The court allowed a second round of summary-judgment briefing on whether the ADEA provided a remedy because Barton was only seeking front pay in lieu of reinstatement. In a second decision, the court held that Barton could not recover for Richardson's discrimination because front pay in lieu of reinstatement would too closely resemble a compensatory-damages remedy for an emotional injury, which is not allowed under the ADEA.

## II. Discussion

Barton's appeal raises three issues: (1) whether Richardson discriminated against him because of age by stripping him of his selling-skills duties; (2) whether Abel or Milton retaliated against Barton for complaining about age discrimination; and (3) whether Zimmer failed to return Barton to an equivalent job after his FMLA leave. We review the district court's order granting summary judgment de novo, viewing the facts in Barton's favor. *See Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011).

## A. ADEA Discrimination

To prove discrimination in violation of the ADEA, Barton must establish that Zimmer subjected him to an adverse employment action because of his age. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002). Zimmer conceded for the sake of argument that Richardson reduced Barton's selling-skills duties because of his age. Like the district court, we will assume that this

was an adverse employment action for purposes of the ADEA.

But Barton has a remedies problem. The ADEA permits reinstatement, back pay, and other "legal or equitable relief as may be appropriate," 29 U.S.C. § 626(b), but not "compensatory damages for pain and suffering or emotional distress," *Comm'r of Internal Revenue v. Schleier*, 515 U.S. 323, 326 (1995). Barton was not fired and his compensation was not reduced, so an award of back pay is unavailable. Because he is totally disabled, he cannot be reinstated (assuming that remedy would otherwise be appropriate). In lieu of reinstatement, Barton seeks front pay: a cash award for what he would have earned if he were reinstated.

In *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852 (2001), a Title VII case, the Supreme Court observed that front pay in lieu of reinstatement resembles compensatory damages because both remedies, in proper circumstances, compensate for a plaintiff's inability to work in the future. Relying on this similarity— although not on *Pollard* specifically—the district court held that front pay is unavailable as a matter of law because it would amount to an award of compensatory damages for an emotional injury.

*Pollard* went on to hold, however, that front pay under Title VII is *not* properly classified as a compensatory-damages remedy and therefore is not subject to Title VII's compensatory-damages cap. *Id.* at 854. Rather, the Court held that front pay is an equitable remedy that may be awarded for lost compensation "between judgment and

reinstatement or *in lieu of reinstatement*," and is available under Title VII's uncapped equitable-remedies provision. *Id*. at 846 (emphasis added). As relevant here, the Court observed that front pay might be an appropriate equitable remedy where "reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination." *Id.*

The ADEA's equitable-remedies provision is similar to Title VII's equitable-remedies provision, *compare* 29 U.S.C. § 626(b) (ADEA) *with* 42 U.S.C. § 2000e-5(g)(1) (Title VII), and based on *Pollard* the front-pay award Barton seeks is probably not categorically unavailable as a compensatory-damages remedy for an emotional injury, as the district court seemed to think. The reasoning of *Pollard* suggests that front pay is an available equitable remedy under the ADEA in the right circumstances, in lieu of reinstatement, just as it is under Title VII. But we need not decide this issue here. Assuming the ADEA authorizes front pay, Barton is not entitled to it. Although the district court did not address this point, we may affirm a judgment on any ground the record supports and the appellee has not waived. *Burns v. Orthoteck, Inc. Emps'. Pension Plan & Trust*, No. 10-1521, 2011 WL 4089798, at *3 (7th Cir. Sept. 15, 2011); *Williams v. Fleming*, 597 F.3d 820, 823 (7th Cir. 2010).

To recover front pay as an equitable remedy in lieu of reinstatement, Barton would have to establish causa-

tion—that is, that Richardson's discriminatory removal of his job duties caused the disability that prevents his reinstatement. *See Pollard*, 532 U.S. at 846 ("In cases in which reinstatement is not viable . . . because of psychological injuries suffered by the plaintiff *as a result of the discrimination*, courts have ordered front pay as a substitute for reinstatement." (emphasis added)). Here, Barton cannot be reinstated because of the psychological disability brought on by the pressure of updating the knee class. But Richardson did not assign the class to Barton; Richardson had already been terminated. Milton assigned this task after Barton returned from his earlier medical leave, and Barton admits that she did so based on Zimmer's corporate needs, not because of his age.[2] Accordingly, there is no causal connection between Richardson's discriminatory removal of Barton's job duties and the psychological disability that prevents reinstatement from being a viable remedy. Barton's disability was caused by an unrelated job assignment from his new supervisor.

In this respect this case resembles *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773-74 (7th Cir. 2002). There, the plaintiff's job was eliminated, but he was given an internal job transfer without any reduction in pay or benefits; he later lost his job for unrelated reasons. He sued his employer under the ADEA alleging that the

---

[2] As we will discuss later, this admission is also inconsistent with Barton's allegation that Milton retaliated against Barton by assigning him the knee class.

company had eliminated his earlier position based on his age. Because of his internal transfer, however, he suffered no loss of compensation or benefits from the alleged discrimination, so back pay was inappropriate. Nor was reinstatement a proper equitable remedy because his termination was not unlawful. Accordingly, we held that even *if* the elimination of his position was motivated by age discrimination, the plaintiff lacked an ADEA remedy. *Id.* at 774.

Similarly here, although Zimmer concedes for the sake of argument that Richardson removed Barton's sales-skills teaching duties because of his age, Barton suffered no loss of compensation or benefits. When he returned from medical leave, Richardson was gone, and Barton's replacement supervisor gave him new responsibilities. These new responsibilities provoked a stress-related psychological disability that led to his eventual early retirement, preventing reinstatement. Here, as in *Franzoni*, the ADEA provides no remedy.

## B. ADEA Retaliation

To prove retaliation in violation of the ADEA, Barton must show that he engaged in statutorily protected activity, that he suffered a materially adverse action, and that the two are causally related. *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 612 (7th Cir. 2001). Under the ADEA retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor. *See Gross v. FBL*

*Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009)[3]; *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010). The issue here is whether Barton suffered a materially adverse action causally linked to his complaints about Richardson's age discrimination.

The standard for a materially adverse action sufficient for a retaliation claim is somewhat more forgiving than for a discrimination claim, but the action must be severe enough to dissuade a reasonable employee from exercising statutory rights. *Lapka v. Chertoff*, 517 F.3d 974, 985-86 (7th Cir. 2008). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). Receiving a challenging work assignment typically is not sufficiently adverse to amount to a retaliatory adverse employment action. *See Lapka*, 517 F.3d at 986.

---

[3] In *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2350 (2009), the Supreme Court interpreted the ADEA's discrimination provision, which prohibits discrimination "because of" age, 29 U.S.C. § 623(a)(1), and does not include an explicit mixed-motives provision like Title VII. The ADEA's antiretaliation provision employs similar language, prohibiting discrimination "because" an employee exercises protected rights. *Id.* § 623(d). Thus, the Court's conclusion that the ADEA requires but-for causation for discrimination claims applies equally to retaliation claims.

Barton contends that Abel removed his responsibility for teaching selling skills and assigned him to update the knee class because he complained about Richardson. This alleged retaliation supposedly occurred when Barton returned to work in September 2005, after Richardson's termination. Barton focuses on communications between Abel and Richardson in which Abel initially agreed with Richardson's assessment that Barton should be transferred or receive new duties. Barton claims that this evidence shows that Abel retaliated against him by taking away his selling-skills duties and giving him the knee-class assignment.

The factual record does not support this theory. Abel did not reduce Barton's selling-skills duties; Richardson did, during the course of the prior year, and this formed the basis of Barton's age-discrimination complaint. Abel could not take away from Barton what was already gone. Furthermore, although the evidence shows that Abel initially concurred in Richardson's assessment of Barton's performance and agreed that he should be reassigned to different job duties, Abel never followed through on these plans. To the contrary, after meeting with Barton and hearing his side of the story, Abel investigated the discrimination claim and eventually recommended Richardson's termination. Afterward, Milton assigned Barton to the knee class, not Abel. Barton asks us to infer retaliatory motive from the fact that Abel initially sided with Richardson. That inference is unreasonable in light of Abel's later actions. Moreover, it is not proof of retaliation because it is not linked to any adverse employment action.

Barton also claims that Milton assigned him to rework the knee class in retaliation for his complaint about Richardson. It is not obvious that Barton's assignment to the knee class was materially adverse, but even if it was, it's not proof of retaliation. Barton contends that retaliatory motive can be inferred from the fact that Milton and Richardson apparently were friends, and Milton thought Richardson had done good things for Zimmer. But Barton also admits that the knee class was important to the company and that Milton made the assignment based on Zimmer's sales-training needs. While he claims the assignment was unreasonable in light of his lack of knowledge of Zimmer's knee-replacement products, he has no evidence that Milton thought it was. To the contrary, Milton knew Barton used to be the Knee MST—Zimmer's top knee-product training manager—and she thought he was qualified to update the class based on this prior experience. No reasonable jury could conclude that Milton, in an act of retaliation, assigned Barton an important project she thought he was fully qualified to perform. Accordingly, the district court properly entered summary judgment for Zimmer on Barton's ADEA retaliation claim.

## C. FMLA Interference

The FMLA permits eligible employees to take medical leave under certain conditions. *See* 29 U.S.C. §§ 2612, 2614. With one exception not applicable here, upon returning to work, leave-taking employees are "to be restored by the employer to the position of employment held by

the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1). However, a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B).

To prove his FMLA claim, Barton must establish that: (1) he was eligible under the FMLA; (2) Zimmer was covered by the FMLA; (3) he was entitled to FMLA leave; (4) he provided sufficient notice of his intent to take leave; and (5) Zimmer denied him benefits due under the FMLA. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008). Only the fifth element is in dispute. Barton claims he was not restored to the equivalent of his old job when he returned from leave. Zimmer responds that Barton was given the same or similar duties he would have received had he not taken leave.

The undisputed evidence supports Zimmer. Barton returned from leave the day after Richardson was terminated. Throughout this period, Barton's pay, benefits, title, and rank remained intact. His job duties undoubtedly changed, but that was inevitable. His only duties prior to taking leave involved two short-term projects that were completed during his leave. So when Barton returned, he had no work to do. Business needs unrelated to his leave required that the knee class be updated. Barton was qualified to do this work based on his past service as Knee MST (or so Milton rea-

sonably thought), and Milton assigned him the class. No evidence suggests that she did this because Barton took medical leave or that something different would have occurred had Barton never left. The district court properly entered summary judgment for Zimmer on Barton's FMLA claim.

AFFIRMED.