In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3572

SHANNON VOLLING and ALLEN SPRINGER,

*Plaintiffs-Appellants*,

*v.*

KURTZ PARAMEDIC SERVICES, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14-cv-4423 — **Sharon Johnson Coleman**, *Judge*.

ARGUED SEPTEMBER 15, 2016 — DECIDED OCTOBER 19, 2016

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs Shannon Volling and Allen Springer brought federal and state retaliation claims against Antioch Rescue Squad ("ARS") and its subcontractor, Kurtz Paramedic Services, Inc. ("Kurtz"). Plaintiffs allege the companies wrongfully refused to hire them as emergency medical technicians ("EMTs") because of plaintiffs' earlier complaints alleging sexual harassment against ARS and Metro Paramedic

Services, Inc. ("Metro").[1] Plaintiffs settled with ARS, and
Kurtz moved to dismiss plaintiffs' claim. The district court
dismissed the case with prejudice. We affirm, in part, and re-
verse, in part.

## I. Background

### A. Factual Background

Plaintiffs Shannon Volling and Allen Springer worked as
EMTs for Metro and its contractor, defendant ARS. ARS pro-
vided emergency medical services and ambulance transport
to the Village of Antioch and surrounding areas using a two-
tiered employment structure. For daytime, weekday shifts,
ARS used paid EMTs through subcontracts with private am-
bulance companies. For evening and weekend shifts, ARS
used unpaid EMT volunteers. Volling began working for ARS
as an unpaid, evening and weekend EMT in May 2008. Later,
in March 2010, she transitioned to paid, weekday shifts under
ARS and Metro. Springer began working for ARS and Metro
in 2009.

In April 2011, Volling filed charges against ARS and Metro
with the Equal Employment Opportunity Commission, alleg-
ing sexual harassment, discrimination, and retaliation. Later,
in July 2011, Volling filed a complaint in the Northern District
of Illinois against ARS and Metro, alleging sex discrimination
and misconduct in violation of the Emergency Medical Ser-
vices Act. Volling alleged a panoply of illegal behavior includ-
ing sexual harassment, physical and sexual abuse of patients,
and on-duty alcohol and drug abuse. On October 26, 2011,
Volling reported this misconduct to the Illinois Department of

---

[1] Metro is not a party to the present case.

Public Health, sparking an investigation, fines, and EMT license suspensions. Through June 2012, Volling continued to pursue her federal lawsuit, raise her concerns at ARS meetings, and attend Village of Antioch public meetings addressing ARS issues.

In late 2011, Springer filed a supporting declaration in Volling's lawsuit against ARS and Metro. He also aided the Illinois Department of Public Health's investigation into ARS. Finally, Springer, like Volling, voiced his concerns at both ARS and Village of Antioch meetings.

Plaintiffs alleged that ARS began acting against them immediately after they filed the lawsuit and declaration. Volling claimed ARS reduced her work hours and threatened to terminate her employment. Similarly, Springer claimed ARS disciplined him for talking about Volling's lawsuit and denigrating ARS management.

The alleged retaliation at issue in this case started on June 15, 2012. ARS terminated its subcontract with Metro and all eight daytime, weekday Metro EMTs. On the same day, ARS replaced Metro with defendant Kurtz. The next day, Kurtz began exclusively hiring former Metro EMTs. Kurtz did not publicize its EMT vacancies or inform plaintiffs about them. ARS instructed every former Metro EMT—except plaintiffs—on how to apply for employment under the new Kurtz contract. Kurtz then asked ARS for the former Metro EMTs' contact information to schedule interviews.[2] Neither Volling nor Springer received application instructions, applied, or interviewed for a Kurtz EMT position. Ultimately, within one day,

_____

[2] The record does not reflect whether ARS delivered plaintiffs' contact information to Kurtz.

ARS and Kurtz allegedly "jointly" rehired every other Metro EMT except Volling and Springer.

### B. Procedural Background

In June 2014, plaintiffs filed suit against ARS and Kurtz, bringing federal and state retaliation claims. First, plaintiffs alleged ARS and Kurtz acted against them for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) ("Title VII"). Second, they said defendants violated the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101, *et seq.* ("IHRA") and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1, *et seq.* ("IWA"). ARS settled with plaintiffs. Kurtz moved to dismiss plaintiffs' complaint.

On March 9, 2015, the district court granted Kurtz's motion to dismiss. The court found plaintiffs had failed to exhaust their administrative remedies as required under Title VII and the IHRA. The district court also concluded that, regardless, plaintiffs had failed to adequately state a claim for relief, as they did not apply for employment with Kurtz. Plaintiffs moved for reconsideration and for leave to file an amended complaint. On July 10, 2015, the district court granted the latter request.

On July 31, 2015, plaintiffs filed an amended complaint with additional details, alleging the same violations. Kurtz again moved to dismiss plaintiffs' complaint. This time, the district court dismissed plaintiffs' case with prejudice. The court first found plaintiffs had failed to establish an adverse employment action under Title VII and the IHRA, as they did not apply for employment with Kurtz. Further, the court held that plaintiffs failed to adequately link their protected activity

against ARS and Metro to any adverse employment action. Finally, the district court dismissed plaintiffs' IWA claims because they were never Kurtz's employees and were outside the statute's scope.

Plaintiffs now appeal.

## II. Discussion

We review de novo a district court's grant of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016) (citation omitted). "In construing the complaint, we accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Id*. (citation omitted). To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Title VII and the Illinois Human Rights Act

"Title VII prohibits various 'unlawful employment practices' involving discrimination on the basis of 'race, color, religion, sex or national origin.'" *E.E.O.C. v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting 42 U.S.C. §§ 2000e–2, 2000e–3). Title VII also prohibits discriminating against an employee "because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Retaliation is also "a cognizable claim under … the IHRA." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d

866, 887 (7th Cir. 2016) (citing 775 Ill. Comp. Stat. 5/6-101). Illinois courts apply the federal Title VII framework to IHRA claims. *See Rabé v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013) (citing *Zaderaka v. Ill. Human Rights Comm'n.*, 545 N.E.2d 684, 687 (Ill. 1989)). To succeed on a Title VII retaliation claim, plaintiffs must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (citation omitted).

In the case at hand, it is undisputed that plaintiffs engaged in protected activity. The dispute, therefore, revolves around the final two elements.

### 1. *Materially Adverse Employment Action*

Plaintiffs allege Kurtz refused to hire them in retaliation for their engaging in protected activity against ARS and Metro. In the "failure to hire" context, a plaintiff satisfies the materially adverse employment action requirement by showing she "(1) … engaged in a statutorily protected activity; (2) … applied and had the technical qualifications required for the … position; (3) … was not hired for the position; and (4) a similarly situated individual who did not [engage in statutorily protected activity] was hired for the position." *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 812 (7th Cir. 2005). It is undisputed that plaintiffs engaged in protected activity, were qualified for the job, were not hired, and that others who did not engage in protected activity were hired. What the parties dispute is whether plaintiffs' failure to apply to the new Kurtz positions is fatal to their retaliation claims.

We conclude plaintiffs adequately pled an adverse employment action against Kurtz despite not applying for the EMT positions. "[T]he Supreme Court made clear in *McDonnell Douglas* that the prima facie [Title VII] case is not inflexible … " *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 821 (7th Cir. 2006). "The facts necessarily will vary in Title VII cases, and the … prima facie proof required from [employees] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973); *see also Int'l. Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (Title VII plaintiffs need only initially "create an inference that an employment decision was based on [an illegal] discriminatory criterion"); *Ortiz v. Werner Enters., Inc.*, — F.3d —, No. 15-2574, 2016 WL 4411434, at *5 (7th Cir. Aug. 19, 2016) (observing that "all evidence belongs in a single pile and must be evaluated as a whole" rather than separated artificially between direct and indirect methods of proof). As such, "[t]he expression 'prime facie case' in Title VII litigation popularly refers to a common, but not exclusive, method of establishing a triable issue of intentional discrimination." *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994) (citation omitted).

In light of this flexibility, we have previously relaxed the application requirement in certain circumstances. *See id.*; *see also Int'l. Bhd. of Teamsters*, 431 U.S. at 365 ("The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity."). The district court correctly highlighted the "failure to promote" context as one example. *See Loyd*, 25 F.3d at 523 (no application necessary when an employer "does not solicit and await applications

but hands out promotions on its own initiative in a nonselective, serial fashion"). Another such circumstance, however, exists when "an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting." *Id*. The Supreme Court has recognized that requiring applications in this context could effectively bar "victims of the most entrenched forms of discrimination" from Title VII relief. *Int'l. Bhd. of Teamsters*, 431 U.S. at 367. Employees, for example, may be dissuaded from applying "by the manner in which [the employer] publicizes vacancies [or] his recruitment techniques." *Id*. at 365.

In cases such as this, the employer's "manner" of publication may involve the discriminatory *absence* of publication. Silently preventing protected class members from applying, rather than explicitly deterring them, is harder to detect and prevent. In either case, the prospective employee suffers an adverse employment action despite not applying. Here, by allegedly informing only the former Metro EMTs who had *not* engaged in protected activity of the open positions, Kurtz discriminated against plaintiffs. Thus, plaintiffs' failure to apply stemmed from the very discriminatory practice they complain of, and their failure to apply need not bar their retaliation claims. *See Loyd*, 25 F.3d at 523.

Our decision in *Babrocky v. Jewel Food Co.* is instructive. 773 F.2d 857 (7th Cir. 1985). There, female employees filed a Title VII sexual discrimination claim against both their employer and union for exclusively filling "meat-cutter" positions with men and "meat-packing" positions with women. Jewel relied on union referrals to fill these positions. The district court dismissed the plaintiffs' claims, in part because the women did

not apply for meat-cutting positions. We disagreed and reversed in part, holding that the district court had applied "the *McDonnell Douglas* framework too literally when it rejected the balance of plaintiffs' claims" in the absence of formal applications. *Id*. at 867. We noted, "[n]o notices of vacancies were ever posted, nor had the Union ever recommended any of its women members for these positions. Consequently, the plaintiffs were never informed of the vacancies for which they could apply." *Id*.

The same potential for discriminatory lack of notice presents itself here. Kurtz had EMT openings and relied exclusively on ARS for referrals. The two companies allegedly "jointly" refused to inform plaintiffs of the new EMT positions, while informing all other former Metro EMTs who had not engaged in protected activity. No application is necessary in such circumstances.

Kurtz argues *Loyd* is inapplicable, as plaintiffs complained of sexual harassment against ARS and *Metro,* not Kurtz. It was not *Kurtz*, it concludes, that deterred plaintiffs from applying. Kurtz, however, focuses on the wrong claim of discrimination. While plaintiffs originally alleged sexual harassment against ARS and Metro, they now allege retaliatory discrimination against ARS and Kurtz. It is this second instance of discrimination, plaintiffs allege, that kept them from applying. Again, although *Loyd* identified discrimination that "deters" applicants from applying, logic dictates that discrimination *preventing* applicants from applying also constitutes an adverse employment action. Thus, *Loyd* applies. It is sufficient for plaintiffs to plead that, absent Kurtz's retaliatory discrimination, they would have sought the position. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 n.2 (7th Cir. 2008) (citing *Loyd*,

25 F.3d at 523). They did just that. As a result, Plaintiffs adequately pled an adverse employment action despite not applying for Kurtz employment.

### 2. *Causal Connection*

Next, the district court concluded that plaintiffs failed to allege a causal connection between Kurtz's adverse employment action and their protected activity. Likewise, Kurtz holds itself out as a completely separate, new subcontractor under ARS with no previous relationship to plaintiffs. Kurtz suggests, and the district court agreed, that plaintiffs' allegations tend to state a claim against ARS, and ARS only.

It is true that a formal application can satisfy the causality requirement. "But, of course, it is not true that the causal gap can never be bridged by something short of the formal submission of an application." *Loyd*, 25 F.3d at 523. Rather, inherent in the logic of *Loyd* is the requisite causal connection: An application is unnecessary when a plaintiff can show she would have applied had it not been for the complained-of discriminatory practices. *See id*. (citations omitted).

Here, plaintiffs contend Kurtz's alleged retaliatory discrimination—purposefully failing to inform plaintiffs of the new hiring process—caused plaintiffs' failure to apply. Under the complaint, plaintiffs engaged in protected activity, and Kurtz was allegedly aware of this activity as ARS and Kurtz jointly retaliated against plaintiffs for this activity by intentionally excluding them from the EMT application process. Accordingly, plaintiffs adequately pled a causal connection

between an adverse employment action and their protected activity.[3]

Both the district court and Kurtz question why Kurtz would be motivated to retaliate against plaintiffs' protected activity against ARS and *Metro*. Both, however, overlook the fact that "no one may follow the rule 'we do not employ anyone who has ever made a Title VII charge against a prior employer.'" *Flowers v. Columbia Coll. Chi.*, 397 F.3d 532, 533 (7th Cir. 2005) (citation and quotation marks omitted). Indeed, "[n]o employer may retaliate against someone who makes or supports a charge of discrimination against *any* employer." *Id*. at 534. Thus, regardless of Kurtz's motive behind its alleged retaliation, plaintiffs successfully pled a Title VII discrimination claim against it.[4]

Accordingly, we reverse the district court's opinion regarding plaintiffs' Title VII and IHRA claims and remand for further proceedings. Plaintiffs adequately pled both an adverse employment action and a causal link between that action and their protected activity.

### B. The Illinois Whistleblower Act

Next, plaintiffs allege Kurtz violated the IWA. The district court, however, correctly dismissed this claim.

---

[3] Plaintiffs also allege they presented sufficient circumstantial evidence illustrating a causal connection between their protected activity and Kurtz's adverse employment action. We find no need to turn to circumstantial evidence in light of the above allegations.

[4] Plaintiffs also borrow from labor law and argue ARS and Kurtz are "joint employers," attempting to impute to Kurtz ARS's retaliatory motive and knowledge. We do not address ARS and Kurtz's employment relationship, as it is irrelevant at this stage of the litigation.

Plaintiffs first argue the district court erroneously retained pendent jurisdiction over their remaining state law claims after dismissing their Title VII claim. The district judge, however, "is given broad power in determining … whether it is appropriate to retain jurisdiction over the state law claims." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998). "Pendent jurisdiction is a power which the district court, in the exercise of its sound discretion, may choose to grant … ." *Id*. As such, the district court did not abuse its power in retaining jurisdiction over plaintiffs' state IWA claim.

The district court also correctly dismissed the IWA claim. The IWA provides that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. It defines "employee" as "any individual who is employed on a full-time, part-time, or contractual basis by an employer." 740 Ill. Comp. Stat. 174/5. Plaintiffs say the IWA should be read to include "prospective employees," pointing to Title VII and the IHRA. The plain language of the statute, however, does not warrant such a reading. Moreover, plaintiffs' reliance on other statutes is unpersuasive. Unlike in the Title VII and IHRA contexts detailed above, plaintiffs do not cite here to any cases illustrating flexibility in the requisite employment relationship for purposes of the IWA. As such, this case falls outside the statute's scope. We agree with the district court that plaintiffs' IWA claims cannot proceed because plaintiffs were never Kurtz employees.

## C. Circuit Rule 36

Finally, plaintiffs move for this Court to assign the case to a new district judge pursuant to Circuit Rule 36. This Court has invoked Circuit Rule 36 "to avoid the operation of bias or mindset which seems likely to have developed from consideration and decision of motions to dismiss or … the like." *CMFG Life Ins. V. RBS Sec., Inc.*, 799 F.3d 729, 750 (7th Cir. 2015) (quoting *Cange v. Stotler & Co.*, 913 F.2d 1204, 1208 (7th Cir. 1990)). We see no indication of bias and are confident that upon remand the district court will consider the issues fairly. As such, we see no reason to reassign the case, and deny the request.

## III. Conclusion

For the foregoing reasons, we AFFIRM, in part, and REVERSE, in part, the judgment of the district court and REMAND for further proceedings.