In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 24-3250

ALMA SANCHEZ, on behalf of herself and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

EL MILAGRO, INC., doing business as EL MILAGRO,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-01852 — **LaShonda A. Hunt**, *Judge*.

───────────────

ARGUED NOVEMBER 5, 2025 — DECIDED MAY 27, 2026

───────────────

Before RIPPLE, KIRSCH, and LEE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Alma Sanchez, invoking Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act (IHRA),[1] claimed that she was sexually harassed by a coworker at an El Milagro tortilla factory. She further alleged

───────────────

[1] 42 U.S.C. § 2000e et seq.; 775 Ill. Comp. Stat. 5/1-101 et seq.

that El Milagro had failed to investigate promptly her allegations. The district court granted summary judgment for El Milagro, and Ms. Sanchez brought this timely appeal. For the reasons set forth in this opinion, we affirm the judgment of the district court.

## I

## BACKGROUND[2]

El Milagro manufactures and distributes tortilla products. It operates eight locations in Illinois and employs approximately 500 individuals. At the Chicago manufacturing facility involved in this case, the production department has multiple lines. Employees on the "back line" use machinery to make tortillas; employees on the "front line" pack the tortillas.

Since Ms. Sanchez joined El Milagro in July 2019, she has worked continuously in the production department on the second shift. Initially, Ms. Sanchez was a "passer." In that role, she verified the quality of newly produced tortillas and passed satisfactory items down a conveyor for packaging and organization. Ms. Sanchez's role later changed because a disability prevented her from moving the fingers on her left hand, and she could not work a full eight-hour shift as a passer. Her supervisors, therefore, permitted her to work as a "free person."[3] In this capacity, Ms. Sanchez substituted on

---

[2] Because this appeal arises from the district court's grant of summary judgment for El Milagro, we must take all facts and draw all reasonable inferences in the light most favorable to Ms. Sanchez. *Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025).

[3] R.154 at 3.

the production line and spent the remainder of her shift performing sweeping and cleaning duties.

Because her supervisors did not require that she work on the production line for a full eight hours, at least eight of her coworkers began to express discontent about her accommodation. At one point (the timing is not clear from the record), they collected signatures with the intent of petitioning El Milagro to terminate Ms. Sanchez's employment. The record is unclear as to whether this petition reached El Milagro's management, but Ms. Sanchez reported her coworkers' comments to Arturo Brito, the second shift supervisor in the production department. Brito took two actions in response. On October 1, 2019, he wrote a report to El Milagro's Human Resources (HR) department. He also raised the issue during a regularly scheduled pre-shift team meeting for the production department employees. After Brito wrote his report to HR, El Milagro provided a formal designation to Ms. Sanchez as a "free person."[4] Ms. Sanchez relates that although her co-workers' adverse comments decreased for a while, they eventually became more frequent. Brito raised the issue again at another meeting.

Francisco Gutierrez is, according to Ms. Sanchez, one of the workers who petitioned for her discharge. Ms. Sanchez claims that Gutierrez sexually harassed her by inappropriately touching her three times over the following year. There is significant ambiguity in Ms. Sanchez's allegations about these encounters. Several record documents frame the ambiguity. One document is a written statement that Ms. Sanchez prepared for El Milagro's HR department when she reported

---

[4] R.135-3 at 44:17–20, 45:06–17.

the third incident on August 30, 2020 ("the HR statement"). The other documents are the operative complaint and her deposition in this lawsuit. The HR statement at times contradicts her complaint and some of her later deposition testimony.

The first inconsistency involves the timing of the alleged incidents of harassment. According to the HR statement, Gutierrez inappropriately touched Ms. Sanchez first in October or November 2019, then in March 2020, and finally in August 2020. But Ms. Sanchez alleges in her operative complaint that Gutierrez touched her first in May or June 2020, then in July 2020, and finally in August 2020. Both her HR statement and her representations in the lawsuit, however, assert that the third and final incident happened on August 29, 2020.

There is also ambiguity with respect to Ms. Sanchez's accounts of how Gutierrez inappropriately touched her. With respect to the first incident, Ms. Sanchez alleges in her complaint that Gutierrez intentionally "rubbed his genitals" against her buttocks as he passed by her on the production line and then continued to walk away.[5] She recounts in her deposition that she believes Gutierrez purposefully touched her because "there were many ways for him to pass through without touching me."[6] He did not touch her for long because "he made it look like he was passing by."[7] When she felt the contact and turned around, "[h]e had already passed."[8] In her

---

[5] R.79 at ¶ 22.

[6] R.145-4 at 77:21–22.

[7] *Id.* at 78:23–24.

[8] *Id.* at 79:19.

HR statement, Ms. Sanchez wrote that Gutierrez "only said sorry."[9] But in her deposition, she said that Gutierrez walked away laughing.[10] He "turned around and stare at me like watching and saying 'oops' [sic]."[11] Ms. Sanchez recounted that she responded not with words but by making a facial expression indicating she found his conduct inappropriate. She "looked at him making him aware that he was making [her] feel uncomfortable."[12]

Ms. Sanchez relates that she verbally reported this first incident two hours later to her supervisor, Brito.[13] El Milagro disputes that Ms. Sanchez reported this incident directly to Brito. Again, the record reveals inconsistent allegations. In her HR statement, Ms. Sanchez stated that although she mentioned this incident to Brito, she did not tell him Gutierrez's name.[14] She claimed at one point in her deposition, however, that she "specifically told [Brito] that Mr. Gutierrez had rubbed his genitals on my buttocks."[15] But when asked outright, she agreed that she did not share Gutierrez's name with Brito when she reported the first incident.[16] Brito stated in his deposition that she did not complain to him about sexual

---

[9] R.135-16 at *3.

[10] R.145-4 at 65:18.

[11] *Id.* at 79:22–23.

[12] *Id.* at 65:08–09.

[13] R.135-3 at 84:14–20.

[14] R.135-16 at *3.

[15] R.145-4 at 84:22–24.

[16] R.135-15 at 12:18.

harassment at all prior to August 2020.[17] No report was made to HR about this individual incident.

Ms. Sanchez alleges that Gutierrez sexually harassed her for the second time in July 2020. She claims that he groped her buttock with his hand. Ms. Sanchez again contradicts herself about when she reported this incident. She wrote in her HR statement that she could not have reported the incident because the factory had shut down because of the pandemic.[18] But her Rule 56.1 statement recited that she did report the harassment to Brito the day after it happened.[19] Brito did not forward a complaint about this incident to HR.

The third and final incident occurred on August 29, 2020. Ms. Sanchez contends that Gutierrez touched her buttocks for "a short time," or "a few seconds" while she was stooping down to put down boxes that she was holding.[20] He apologized afterwards.[21] There is ambiguity about the precise manner of touching. In her earlier written statement to HR, she claimed that Gutierrez touched her buttocks with one hand.[22] Ms. Sanchez's Rule 56.1 statement asserted, however, that Gutierrez groped her with both hands when she bent over to put down a box she was carrying.[23]

---

[17] R.152-3 at 116:11.

[18] R.135-16 at *3.

[19] R.145 at ¶ 9.

[20] R.135-3 at 95:17, 96:14–16.

[21] *Id.* at 96:18.

[22] R.135-16 at *3.

[23] R.145 at ¶ 11.

The record is also unclear about some of the details of the events after this last incident. In her deposition, Ms. Sanchez related that Brito's assistant, Rafael Ortega, noticed that she was upset and that she told him what had happened. Ortega then told her that he would inform Brito and that she should either complain in writing or go directly to HR.[24] Brito stated in his deposition, however, that Ms. Sanchez spoke to him directly.[25] He also stated that he told Ms. Sanchez a "report would have to be done because it was something serious."[26] The reporting requirement at El Milagro mandated that Brito have the complaining employee write out her account and that Brito speak to the other involved parties and direct those individuals to write out their own versions. Brito then would write his own report and send it to HR, along with the statements of those involved in the incident. HR would then follow up on the case.[27]

Ms. Sanchez submitted her written statement to HR describing the three incidents. In his statement, Gutierrez related that on August 29, 2020, he touched Ms. Sanchez "by mistake" while he was packing tortillas and "asked her for forgiveness."[28] He claimed also that an hour later, he stepped back into a different coworker and apologized to her. He said that the space was limited and the touching was an accident.

---

[24] *Id.*

[25] R.152-3 at 115:10–13.

[26] *Id.*

[27] *Id.* at 115:15–24.

[28] R.135-16 at *11.

Ms. Sanchez has not seen anyone else experience sexually harassing conduct at any time during her employment at El Milagro. However, after the three incidents with Gutierrez, Jose Guzman, an employee, told her that other employees could "grab [Ms. Sanchez's] butt" because Gutierrez was not fired.[29] Guzman and three other employees made additional sexual remarks that she overheard and that may have concerned her. Ms. Sanchez reported the comments to Brito but did not tell him or HR the names of the employees who made them because she believed that reporting would not help.[30]

## II

## DISCUSSION

## A

We review de novo the grant of summary judgment to El Milagro. *Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025). The basic substantive principles that govern our decision are well-settled and familiar. Title VII and the IHRA prohibit sexual harassment in the workplace. Although Ms. Sanchez contends that the standards for determining sexual harassment under the two provisions differ, she does not identify any difference between the two laws that are relevant to her claims. While she correctly points out that the text of the IHRA is not identical to that of Title VII, both this court and Illinois state courts consistently state that the analytical standards are the same. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) ("Illinois courts apply the federal Title VII framework to IHRA claims." (citing *Rabé v.*

---

[29] R.145 at ¶ 72.

[30] *Id.* at ¶¶ 72–73, 76–77.

*United Air Lines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013)));
*see also Wong v. Midwest Gaming & Ent. LLC*, 228 N.E.3d 792,
797 (Ill. App. Ct. 2023) ("To determine the existence of a hos-
tile work environment sufficient to sustain a sexual harass-
ment claim [under the IHRA], a plaintiff must establish that
[…] the conduct was severe or pervasive enough to create a
hostile work environment."); *Trayling v. Bd. of Fire & Police
Comm'rs of Bensenville*, 652 N.E.2d 386, 394 (Ill. App. Ct. 1995)
("The Supreme Court's decision in *Harris*," which required
that conduct be "severe or pervasive enough to create an ob-
jectively hostile or abusive work environment," "should be
applied to sexual harassment claims brought pursuant to the
IHRA." (citation modified)).

Present case law also establishes firmly that Title VII and
the IHRA do not prohibit all workplace conduct that good
managers and good employees would consider unacceptable.
To constitute *actionable* sexual harassment, the activity "must
be sufficiently severe or pervasive to alter the conditions of
[the victim's] employment and create an abusive working en-
vironment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986).
"[W]hether an environment is 'hostile' or 'abusive' can be de-
termined only by looking at all the circumstances." *Harris v.
Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "These may include
the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes
with an employee's work performance." *Id.* But "no single
factor is required." *Id.*

It is also well-established that hostile work environment
claims require that the facts be assessed through *both* a subjec-
tive and an objective lens. First, the victim must "subjectively

perceive the environment to be abusive." *Id.* at 21. Here, the district court decided that Ms. Sanchez subjectively perceived the El Milagro environment to be abusive and that the parties agreed on this point. Secondly, the facts must be assessed from an objective lens. The conduct must be of such a character that a reasonable person would find it offensive in the workplace. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). Determining what conduct satisfies the objective requirement and what falls short is a sensitive line-drawing problem. And "[d]rawing the line is not always easy." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Moreover, on this point, we must be careful not to substitute judicial predilections for jury determinations. Here, precedent from the Supreme Court, our court, and our sister circuits supply significant guidance on the sort of conduct that a trier of fact might conclude to constitute sexual harassment. To begin, it is well-established that verbal utterances that are fairly characterized as "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," are not, by themselves, actionable. *Id.* at 430. More severe, assaultive speech, especially of a repetitive nature, can yield a different result. *See, e.g.*, *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788–89 (7th Cir. 2007) (holding that a jury reasonably could find a hostile work environment created by at least eighteen sexist or sexual comments over ten months).

Notably, as a general principle, situations involving physical acts are considered "more severe than harassing comments alone." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (citation modified). *See also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (noting that prohibiting "[p]hysical sexual assault" under Title VII is "routine[]" in the courts of appeals).

Nevertheless, "[p]hysical harassment lies along a continuum just as verbal harassment does." *Hostetler*, 218 F.3d at 808. The Second Circuit put it well in *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012), when it pointed out that courts "must take care […] not to view individual incidents in isolation" because the individual alleging harassment experiences the entire context of her working environment, not a series of piecemeal events. We therefore have acknowledged that some physical contact, especially among friends, might be considered neither severe nor pervasive absent "aggravating circumstances such as continued contact after an objection." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006). Even cruder acts, if they occur in isolation, might be considered not actionable, depending on the circumstances. "But when the physical contact surpasses what '(if it were consensual) might be expected between friendly coworkers … it becomes increasingly difficult to write the conduct off as a pedestrian annoyance.'" *Id.* (quoting *Hostetler*, 218 F.3d at 808). "When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their body is usually not one of them." *Id.*

Our cases have made clear, however, that the inappropriate touching of an intimate body part presents a particularly egregious situation. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685–86 (7th Cir. 2010). Put bluntly, "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001). This is a principle well-established not only in this circuit but in the other circuits that have had to address the question. The Second Circuit set forth the rule succinctly in *Redd*: "The repeated touching of intimate parts of an unconsenting

employee's body is by its nature severely intrusive and cannot properly be characterized as abuse that is 'minor.'" 678 F.3d at 179. In enforcing our Country's sex discrimination law, the federal courts have, with one voice, regarded the touching of intimate body parts as an especially intrusive invasion of an employee's autonomy and human dignity. *See Rene*, 305 F.3d at 1065 (collecting cases).[31]

**B**

With these principles in mind, we now turn to the case before us. We are confronted with two fact-based disputes.[32] The first is Ms. Sanchez's allegation that Gutierrez sexually harassed her through three separate acts. The second is her allegation that El Milagro was negligent in addressing her complaints with respect to these episodes.

---

[31] Notably, but predictably, none of the cases differentiate on whether the touching intrusion was through the victim's clothes. Indeed, it appears that, in all the published cases, the victim remained clothed. Assessing the severity of the touching of intimate body parts on such a basis would be the worst sort of casuistry. Assessing the severity of such an intrusion by holding a stopwatch on it is worthy of the same characterization.

[32] Ms. Sanchez's opposition to El Milagro's summary judgment motion is dependent on her own account of the events that she says occurred at El Milagro. Ms. Sanchez may rely on her own testimony. *See Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Payne v. Pauley*, 337 F.3d 767, 770–73 (7th Cir. 2003)). "It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, where "[t]he only evidence supporting" a claim against a defendant is the plaintiff's "own testimony," a court must "assess that testimony to determine whether a reasonable jury could credit [her] version of the disputed facts that could support a verdict in [her] favor." *Whitaker*, 144 F.4th at 918.

**1**

All three incidents here involved Gutierrez's touching Ms. Sanchez's buttocks. The first incident is particularly troubling because it involved Gutierrez rubbing his genitals against Ms. Sanchez's buttocks. While "even one act of harassment will suffice if it is egregious[,]" we need not decide here whether this act should be so characterized. *Hostetler*, 218 F.3d at 808. Rather, we must assess this act as one of three unwanted intimate bodily intrusions and in light of the manifest hostility of Gutierrez toward Ms. Sanchez. We must consider whether, given the circumstances here, a fact-finder could reasonably conclude that these intrusions changed the conditions of her employment.[33]

The district court here remarked that "courts frequently hold that circumstances far more egregious than those present in this case fail to qualify as objectively severe or pervasive harassment."[34] Indeed, some of our cases do, at least on the surface, describe significant misbehavior.[35] As we explain in

---

[33] We do not know whether Ms. Sanchez's account would be accepted by a trier of fact. She would face significant hurdles in that regard. Her own deposition testimony admitted to a certain tentativeness about Gutierrez's intent at the time of the first incident. Specifically, Ms. Sanchez described this moment as one she initially wanted to see as accidental. The finder of fact would have to assess this testimony; that assessment is not ours to make.

[34] R.154 at 12.

[35] In *Koelsch*, for instance, the plaintiff's claim failed when she alleged that her company's president "removed his shoe and rubbed his foot against [her] leg," continuing "despite her demands that he stop"; told her that he found her attractive; and later "grabbed [her] buttocks." *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 706–07 (7th Cir. 1995). In *Anderson*, a terminated restaurant waitress alleged that "[p]atrons touched her inappropriately 'a

the next section, while we affirm the grant of summary judgment, we think that a reasonable fact-finder could conclude that these particular facts of alleged harassment constitute behavior forbidden by the statute. Here, the jury would be entitled to conclude that Gutierrez's misbehavior was motivated by an intent to force Ms. Sanchez out of El Milagro because of his upset at her accommodation. The jury would be entitled to conclude that these events, each egregious in itself, also were part of a long-haul campaign of attrition to make Ms. Sanchez's time at El Milagro miserable.[36] And the comments Ms. Sanchez later overheard from coworkers could be seen to have contributed. When viewing these incidents in their totality, and when viewed in light of the apparent purpose of attempting to induce Ms. Sanchez to leave the company, they are the type of sexual harassment that the law was designed to prevent.

**2**

We now turn to El Milagro's liability for the conduct of its employees. Gutierrez, along with the individuals who made comments about Ms. Sanchez, are Ms. Sanchez's co-

---

lot,' and a coworker grabbed her butt once and hugged her inappropriately two or three times. [The bar manager] called her a 'bitch,' and [the co-owner] told her to wear tight, form-fitting clothing because it looked better on her." *Anderson v. Mott Street*, 104 F.4th 646, 651 (7th Cir. 2024). We rejected a plaintiff's claim where a coworker crawled into her bed in a hotel on a work trip after he had touched her arm and lower back on their way to an earlier dinner. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 882 (7th Cir. 2018).

[36] *Cf. Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (finding no hostile work environment after "four isolated incidents in which a coworker briefly touched her arm, fingers, or buttocks").

workers.[37] Consequently, El Milagro "is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). To prove such negligence, Ms. Sanchez must establish two points: first, that El Milagro had "notice or knowledge of the harassment," *Parkins v. Civ. Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998), and second, that El Milagro did not take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (quoting *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009)).[38]

**a**

"With respect to the extent of the notice given to an employer, a plaintiff 'cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed.'" *Parkins*, 163 F.3d at 1035 (quoting *Zimmerman v. Cook Cnty. Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)).

At the outset, the parties dispute whether Brito was a "supervisor." El Milagro maintains that Brito had "no authority to terminate, transfer, or otherwise discipline employees" because he was a "low-level supervisor."[39] But El Milagro's policies designate Brito as one of the individuals in the

---

[37] R.145 at ¶¶ 31, 71–73.

[38] The IHRA holds employers liable for sexual harassment by nonsupervisory employees "only if the employer becomes aware of the conduct and fails to take reasonable corrective measures." 775 Ill. Comp. Stat. § 5/2-102(D).

[39] Appellee's Br. 53.

management chain of command to whom Ms. Sanchez could report harassment. El Milagro admits that Brito is the "second shift Supervisor in the Production department."[40] The El Milagro employee handbook policies state that "any employee who becomes aware of an incident of sexual harassment, whether by witnessing the incident or being told of it, must report it to their immediate supervisor, to the Human Resources department, or to any other member of management with whom the employee feels comfortable."[41] "Prompt reporting to one of these individuals allows El Milagro to take prompt investigation and appropriate disciplinary action."[42] If a jury accepts Ms. Sanchez's assertion that she reported the harassment to Brito, as the handbook instructed her, El Milagro is "accountable to the standard of care that it created for itself." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 932 (7th Cir. 2017). Whatever Ms. Sanchez told Brito about Gutierrez's harassment, El Milagro was on notice of it.

### b

Ms. Sanchez also must establish the adequacy of her notice to El Milagro. She must have provided Brito with "enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Parkins*, 163 F.3d at 1035 (quoting *Zimmerman*, 96 F.3d at 1019). It is undisputed that HR learned of Ms. Sanchez's allegation of harassment no earlier than August 30, 2020.[43] El Milagro,

---

[40] R.135 at ¶ 30.

[41] R.135-7 at 18.

[42] *Id.*

[43] R.145 at ¶ 46.

however, disputes that Ms. Sanchez reported the first two incidents of harassment to Brito shortly after they happened. At summary judgment, we assume that she did so, based on her assertions in her depositions.[44]

Ms. Sanchez testified in her deposition that she reported the first incident of touching to Brito about two hours after it occurred. Ms. Sanchez recounts that, during the conversation with Brito, she told him that "Mr. Gutierrez had rubbed his genitals on my buttocks."[45] She told him "that I felt very bad and I felt very uncomfortable with what had happened."[46] Ms. Sanchez claims at one point that she told Brito the touching was intentional.[47] But she said at another point in the deposition, while she was describing the written statement she had made to HR, that while she "knew that it wasn't an accident, I tried to see it that way."[48] In the written statement, she wrote that "[a]t first I wanted to see it as an accident, but as time has passed and it has happened other times I don't think so."[49]

---

[44] We describe the record inconsistencies on this point above. But El Milagro also contends that, even if Ms. Sanchez did immediately report the first two incidents to Brito, she did not identify Gutierrez. As we note in the text, the problem for Ms. Sanchez is that in her deposition the description of what she told Brito gave him a basis to believe the first two incidents of touching were accidents.

[45] R.145-4 at 84:23–24.

[46] *Id.* at 85:03–04.

[47] *Id.* at 85:08.

[48] R.135-15 at 11:18–19.

[49] R.135-16 at *7.

Ms. Sanchez said that Brito responded to her verbal complaint by saying she should "try to not put myself in places where I would be exposed, to look for another place for me [sic] work area where I would not be exposed to being touched."[50] In response, she asked him "what am I going to do if that's my work area?"[51] He said, "you have to try to put yourself in another area where you're not exposed."[52] She told him, "why don't you tell them they should say, 'excuse me,' or if they don't want to say excuse me, they can say 'move' or 'get away from there because I have to go through.'"[53] Brito responded that "that's the way they had been educated and he couldn't do anything regarding that."[54] She "didn't respond" because she "felt very uncomfortable" and "very frustrated."[55] The conversation lasted between fifteen and twenty minutes. Ms. Sanchez said that she knew Brito took no further action to investigate or reprimand Gutierrez after this conversation "[b]ecause he took it as an accident."[56]

Ms. Sanchez testified that after the second incident in July 2020, she complained to Brito the following day. She "told him that again a new accident had happened to me with

---

[50] R.145-4 at 85:11–14.

[51] *Id.* at 85:16–17.

[52] *Id.* at 85:19–20.

[53] *Id.* at 85:22–86:01.

[54] *Id.* at 86:03–05.

[55] *Id.* at 86:07–08.

[56] *Id.* at 86:24.

Gutierrez."[57] Ms. Sanchez, at the time of the deposition, did not believe it was an accident, but in a conversation with Brito, she told him "that again an accident had happened but that is an expression. That is a way I express myself."[58] She described the incident to Brito by explaining "that Mr. Gutierrez had lowered his […] hand touching my buttock on the left."[59] Brito, in response, asked her, "Could it be an accident?"[60] Ms. Sanchez claimed she responded that she "didn't think it was an accident."[61] Brito "told me to try not to get too close to Gutierrez."[62] She then "told him that it wasn't fair for me to be the one having to watch out for him and not him."[63] Brito responded that "it was to avoid more problems."[64] Then Ms. Sanchez walked away, ending the conversation, which was about ten minutes.

Brito denies that either of these conversations took place. He testified in his deposition that he first learned of these events when Ms. Sanchez reported the third incident and that he promptly conducted the initial investigation and forwarded his report to HR, as mandated by company policy.

---

[57] *Id.* at 92:08–09.

[58] *Id.* at 92:14–16.

[59] *Id.* at 92:20–93:01.

[60] *Id.* at 93:04.

[61] *Id.* at 93:06.

[62] *Id.* at 93:08–09.

[63] *Id.* at 93:11–12.

[64] *Id.* at 93:14–15.

El Milagro "can avoid liability for coworker harassment 'if it [took] prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" *Porter*, 576 F.3d at 636 (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)). We do not believe that a reasonable jury could conclude, from Ms. Sanchez's deposition testimony, or any other evidence in the record related to her reporting of the first two incidents, that she gave Brito "enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Parkins*, 163 F.3d at 1035 (quoting *Zimmerman*, 96 F.3d at 1019). As Ms. Sanchez described it in her deposition, what she told Brito led him to believe that she was complaining of accidental touching that happened because the production lines on which she and Gutierrez worked had close quarters. When she reported the second incident to him, for example, she told him that a "new accident had happened to me with Gutierrez."[65]

Notably, after Ms. Sanchez reported the third incident to Brito and he submitted a written report to HR on August 30, 2020, HR undertook its investigation. An HR employee interviewed Ms. Sanchez and Gutierrez separately on September 2.[66] HR concluded that the events described by Ms. Sanchez could not be substantiated. It provided Ms. Sanchez with a letter, dated September 16, informing her that the case was closed and that it had told Gutierrez, in a "call of attention" letter, to immediately change his behavior toward her.[67] "A

---

[65] *Id.* at 92:08–09.

[66] R.145 at ¶¶ 48, 53.

[67] *Id.* at ¶ 59.

prompt investigation is the 'hallmark of a reasonable corrective action.'" *Porter*, 576 F.3d at 636 (quoting *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008)). Although El Milagro did not interview any witnesses, Ms. Sanchez did not identify any.[68] Ms. Sanchez also did not report to anyone the names of the people who made the harassing comments that she overheard after the investigation concluded,[69] so El Milagro could not investigate them. And Ms. Sanchez agrees that Gutierrez has not sexually harassed her since.[70] El Milagro's investigation shows that it "took the harassment seriously and took appropriate steps to bring the harassment to an end." *Id.* It had in place a viable and appropriate mechanism for reporting the misbehavior.

## Conclusion

A reasonable jury could find that the harassment Ms. Sanchez suffered amounted to a hostile working environment. A jury could not reasonably conclude, however, that El Milagro was negligent in fulfilling its responsibilities in responding to the situation. The judgment of the district court is affirmed.

AFFIRMED

---

[68] R.145-4 at 78:20, 89:10, 94:16.

[69] R.145 at ¶¶ 71–74.

[70] *Id.* at ¶ 61.

KIRSCH, *Circuit Judge*, concurring. I join all of the majority opinion except its conclusion in part II.B.1 regarding an issue that we need not reach at all to resolve this appeal. The majority states that Alma Sanchez's allegations establish a hostile work environment within the meaning of Title VII of the Civil Rights Act of 1964. I respectfully disagree that a reasonable person could find the alleged conduct so objectively severe or pervasive as to "affect the terms and conditions of employment." *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024) (citation modified). I would affirm the district court on this ground as well.

Title VII protects individuals from sexual harassment "so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment." *Id.* (citation modified). It is not, however, a "general civility code," *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (citation modified), making employers potentially liable for the "isolated incidents, teasing, and other unpleasantries" that are "unfortunately, not uncommon in the workplace," *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018). Our inquiry is therefore whether the plaintiff can clear Title VII's "high bar." *Id.*

Here, Sanchez alleges that Francisco Gutierrez, another employee at El Milagro, touched her inappropriately on three occasions. As the majority recognizes, assessing such interactions often presents a difficult line-drawing exercise. See *id.* at 882. But the misconduct that Sanchez alleges—that Gutierrez made contact with her buttocks while he passed behind her, and that he subsequently touched her buttocks on two other occasions—falls short of establishing a hostile work environment. In concluding otherwise, the majority characterizes these incidents between Sanchez and Gutierrez as "unwanted

intimate bodily intrusions." *Ante*, at 13. But the majority ignores the nature of those interactions, the first two of which were sufficiently fleeting and ambiguous that Sanchez herself referred to them as accidents. *Ante*, at 17–19. These incidents are far less threatening and severe than the intimate contact we've found sufficient to create a hostile work environment. Compare *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (identifying contact with an intimate body part sufficient to establish a hostile work environment, such as when a defendant placed his hand on the plaintiff's breast for several seconds, when a coworker forcibly kissed the plaintiff and nearly removed her bra, and when a manager put his hand inside the plaintiff's shorts, reaching her underwear), with *Anderson*, 104 F.4th at 652 (finding no hostile work environment when the plaintiff alleged that a coworker touched her inappropriately three or four times, including grabbing her buttocks).

The comments from other coworkers that Sanchez overheard don't save her claim against El Milagro, either. She alleges that crude remarks were made about her and other female employees. But Title VII does not prohibit all verbal harassment in the workplace, because "vulgar banter … generally does not create a work environment that a reasonable person would find intolerable." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (citation modified). The comments alleged here don't cross that threshold. They were made by coworkers, entitling them to less weight than, for instance, harassing remarks made by a direct supervisor. See *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1117 (7th Cir. 2022). And most of these remarks weren't even directed towards Sanchez, further lessening their impact. *EEOC v. Vill. At Hamilton Pointe LLC*, 102 F.4th 387, 402 (7th Cir. 2024)

(observing that comments made to non-plaintiffs carry less weight than comments made to the plaintiff). So, even considering these comments alongside Gutierrez's actions, no reasonable person could find Sanchez's working conditions objectively hostile. See *Anderson*, 104 F.4th at 652 (finding no hostile work environment where, in addition to inappropriate touching on three or four occasions, the plaintiff was directed to wear tight, form-fitting clothing and was called a "bitch").

Finally, to the extent that the majority is suggesting that Gutierrez's subjective motivations bolster Sanchez's ability to establish an objectively hostile work environment, *ante*, at 14, that proposition finds no support in our law. Perhaps Gutierrez behaved as he did because he wanted to force Sanchez out of El Milagro; perhaps not. But our inquiry is whether the conduct alleged "transform[ed] the workplace to a degree that implicates Title VII." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). No reasonable person could find that it did.

LEE, *Circuit Judge*, concurring in part and dissenting in part. I join Judge Ripple's opinion as to Sections I, II.A, and II.B.1. First, I agree that the facts here could lead a reasonable jury to find a hostile work environment under our existing caselaw. I also agree that, on these facts, any notice to Arturo Brito would be sufficient to constitute notice to El Milagro. Lastly, I agree that once Alma Sanchez provided notice to El Milagro after the third incident, the company took sufficient steps to address the alleged harassment.

That said, for the reasons I will explain, I believe there is a genuine dispute of material fact as to whether Sanchez informed Brito after the first and second incident that Francisco Gutierrez had acted intentionally when touching her. As such, I would reverse the judgment of the district court and remand for further proceedings.

As a threshold matter, I tend to believe that, viewed in the light most favorable to Sanchez, the first incident, where Gutierrez is alleged to have "rubbed his genitals" against Sanchez's buttocks as he passed by her, is sufficient to give rise to a hostile work environment. R.145-4 at 77:21–22; *see Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury.").

As our circuit makes clear, "[t]here is no 'magic number' of incidents required to establish a hostile environment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994)). "[E]ven one act of harassment will suffice if it is egregious." *Id.* Assuming the truthfulness of Sanchez's account (something we must do at this stage), a reasonable

juror could find that, when Gutierrez intentionally rubbed his genitals against Sanchez's buttocks (essentially simulating a sexual act), the conduct was sufficiently egregious to alter her work environment. From here, I would go on to evaluate whether Sanchez gave sufficient notice to Brito of this first incident.

"Before liability for sexual harassment can arise, the employee must give 'the employer enough information to make a reasonable employer think that there was some probability that she was being sexually harassed.'" *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006) (quoting *Zimmerman v. Cook Cnty. Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)); *see Durkin v. City of Chicago*, 341 F.3d 606, 613 (7th Cir. 2003) (finding that plaintiff's complaints were too vague to give notice to the employer because "she never expressed her feelings of harassment or offered any specific examples of what she considered harassing or demeaning conduct.").

Here, Sanchez testified that after the first incident, she "specifically told [Brito] that Mr. Gutierrez had rubbed his genitals on [her] buttocks." R.145-4 at 84 ¶ 22–24. When asked if she told Brito that "Gutierrez intentionally rubbed his genitals on [her]," she answered "Yes." *Id.* at 85 ¶¶ 5–8. As the majority points out, this statement appears to be inconsistent with some of her later statements and the written report. And, perhaps, because of this, the jury might discount her credibility. But Rule 56 does not allow us to weigh the conflicting testimony at the summary judgment stage. *See Zemlick v. Burkhart*, 164 F.4th 1004, 1010 (7th Cir. 2026) ("We do not weigh evidence or make credibility determinations—those tasks are entrusted to the factfinder."); *see Allen v. Chi. Transit Auth.*, 317 F.3d 696, 699–700 (7th Cir. 2003) (explaining that

even when a "witness repeatedly contradicts himself under oath on material matters," his credibility "becomes an issue for the jury; it cannot be resolved in a summary judgment proceeding").

Turning to the second incident, Sanchez testified that Gutierrez had groped her buttocks with his hand and that she had verbally told Brito that "a new accident had happened to [her] with Gutierrez." R.145-4 at 92 ¶¶ 6–8. True, she acknowledged during her deposition that she had referred to the incident as an "accident." *See* R.145-4 at 92 ¶ 8. But when asked why she had used the word "accident," she responded that it was "an expression. That is the way I express myself." *Id.* at 92 ¶¶ 14–16. What is more, when Brito asked her if it could have been an accident, she unequivocally stated, "I didn't think it was an accident." *Id.* at 93 ¶ 6. Again, such statements may be useful fodder for Sanchez's cross-examination at trial, but, drawing all reasonable inferences in her favor at summary judgment, jurors could believe that Brito was sufficiently on notice of a hostile work environment after the second incident.

Accordingly, on this record, I would reverse the district court's grant of summary judgment and remand for further proceedings. Thus, I respectfully dissent as to Section II.B.2.